UNITED STATES DISTRICT COURT OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

| | | |
|---|---|---|
| ALAN WILKINSON, | : | Index No. 1:17-cv-7421 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | COMPLAINT |
| NORD ANGLIA EDUCATION LIMITED, NORD | : | |
| ANGLIA EDUCATION, INC., NORD ANGLIA IN- | : | |
| TERNATIONAL SCHOOL NEW YORK (FOR- | : | |
| MERLY KNOWN AS WORLD CLASS LEARNING | : | |
| ACADEMY, NEW YORK), and JOHN DOES 1-5, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

------------------------------------------------------------------X

Plaintiff, Alan Wilkinson ("Wilkinson"), by his attorneys Menaker & Herrmann
LLP, for his complaint against defendants Nord Anglia Education and Nord Anglia Interna-
tional (collectively "Nord Anglia"), and John Does 1-5, alleges as follows:

1.      Wilkinson is an individual with U.K. citizenship, who resided at 155 N.
4th Street, Brooklyn, New York during the events alleged herein.

2.      Upon information and belief, defendant Nord Anglia Education Limited
("NAE") is a foreign corporation with its headquarters located at St. George's Building, Level
12, 2 Ice House Street, Central Hong Kong, China, and is in the business of owning and oper-
ating schools both domestically and internationally.

3.     Upon information and belief, defendant Nord Anglia Education Inc. ("NORD") is a subsidiary of defendant NAE, and is a publicly held corporation trading on the NYSE as NORD.

4.     Upon information and belief, defendant NAE and/or defendant NORD owns and operates defendant Nord Anglia International School NY which is located at 44 East 2nd Street, New York, NY 10003 (the "New York School").

5.     Upon information and belief, defendants John Does 1-5 are individuals residing or doing business in the State of New York, New York City.

<u>JURISDICTION AND VENUE</u>

6.     This suit is brought on the basis of diversity, 28 U.S.C. §1332, as well as on the basis of violation of Federal statutes 15 U.S.C. §78u-6(h)(1)(B)(i), 42 U.S.C. §2000e-3(a).   The amount in dispute is greater than $75,000.

7.     This Court also has jurisdiction of the state law claims herein under the provisions of 28 U.S.C. 1331 in that said claims are joined with violations of Federal Statutes 15 U.S.C. §78u-6(h)(1)(B)(i), and 42 U.S.C. §2000e-3(a).

8.     The material violations at issue in this action took place in New York County.   Accordingly, venue properly lies in the Southern District of New York, pursuant to 28 U.S.C. 1391(b) and (c).

<u>BACKGROUND FACTS</u>

9.     Wilkinson graduated from Liverpool Mores University in 1993 with a Bachelor's Degree in Education, and from the same university in 1996 with a Master's Degree

in Education.   After graduation, he was employed by the Liverpool Education Authority as a teacher from 1993-1997 and by the Al Khubairat Community School in Abu Dhabi from 1997-2000.   In September 2000, Wilkinson started working at the Magyar British School in Budapest.

10.    In or about 2002, Wilkinson became the Head of Primary Education at the British International School located in Budapest, Hungary.

11.    Upon information and belief, NAE purchased the British International School, Budapest (the "Hungarian School").

12.    In Spring 2011, Andrew Fitzmaurice, NAE's CEO ("Fitzmaurice") asked Wilkinson to become the Vice Principal of the NAE School in Abu Dhabi as "a personal favor."

13.    During the period of his employment with NAE, Wilkinson received an Employee of the Year Award, and a Company Award for being a key participant and contributor to the NAE's online university.

14.    Upon information and belief until the termination of his employment, Wilkinson was one of NAE's longest serving employees.

15.    In or about July 2013, Fitzmaurice asked Wilkinson to take the position of Principal of what was then known as The World Class Learning Academy, in New York.

16.    Nicky Duggan-Redfern, the NAE Head of Human Resources ("Duggan-Redfern"), told Wilkinson that she and Fitzmaurice wanted him to go to the New York School because it was "such a mess".   Later, on multiple occasions, Andrew Duffield, NAE's Director of Health and Safety ("Duffield") told Wilkinson he had been handed "a poisoned chalice".

17.     On or about August 7, 2013, Wilkinson and NAE entered into an agreement with respect to his employment at The World Class Learning Academy (A copy of this letter agreement is annexed hereto as Exhibit A).

18.     Upon information and belief, the legal name of The World Class Learning Academy was changed to Nord Anglia International School New York on or about May 2015, in part due to a lawsuit brought by a former admissions officer alleging discrimination by the New York School by Wilkinson's predecessor.

19.     From on or about September 10, 2013 to June 23, 2016, Wilkinson served as Principal of the New York School.

20.     When Wilkinson arrived at the New York School, despite the fact that this was his first position as a principal in the NAE/NORD system, he was not given any formal guidance about his new position, let alone any manuals or documents reflecting any pre-existing policies of the New York School.

21.     The only training with respect to child protection that NAE provided to its staff at the New York School was an online course relating to the legalities of child protection in Great Britain.

22.     When Ann McPhee, Regional Managing Director, North America, for NORD and/or NAE ("McPhee") asked Sara Padilla, NAE North American Director of Human Resources ("Padilla") in February 2016 if Wilkinson had received training from NORD or NAE for his position, Padilla stated he had, which was in fact untrue.

23.     During his time at the New York School, Wilkinson requested that the employees to take classes that would give them training about issues that might arise in a New

-4-

York environment; however, such training was not made a NAE or NORD requirement and only the UK training was provided by NORD and/or NAE.

24.     During Wilkinson's time at the New York School, he regularly worked more than 60 hours per week. Although under the terms of the Letter Agreement he was entitled to 40 days paid vacation and a return flight back to the UK each year, he only used five to six days of vacation each year and did not use the annual return flight, instead spending his vacations dealing with the New York School's marketing and admissions, managing construction projects and the New York School's general operations.

25.     During Wilkinson's time at the New York School, he successfully increased enrollment, prompting Fitzmaurice to compliment his performance, saying the New York School was "small but perfectly formed."


Sexual Abuse Complaint

26.     On or about August 10, 2014, Tshinguta Lufuluabo ("Lufuluabo") was hired to be Receptionist and Personal Assistant to Wilkinson at the New York School.

27.     Lufuluabo's son received a merit scholarship to attend the New York School. This scholarship was sanctioned by both Dr. Lillian Diaz-Imbelli, who was then the New York School's admissions director ("Diaz-Imbelli") as well as David Graves, who was then the Director of NAE North American Schools ("Graves").

28.     In or about April 2015, Lufuluabo informed Wilkinson that her son had been sexually abused by another student at the New York School ("AA").

29.     AA's mother ("BB") was also an employee of the New York School at that time.

30.     Wilkinson asked Lufuluabo to meet with him, along with BB, to discuss the incident.

31.     Although BB denied that the abuse had taken place at this meeting, BB subsequently approached Wilkinson to say that AA had admitted the abuse to her.

32.     That same day Wilkinson reported the abuse claim to the New York State Central Registry, as he was required to do by New York law.

33.     Wilkinson also immediately reported the matter to his then-supervisor, Graves, and Padilla. He requested their assistance in dealing with this matter.

34.     Wilkinson brought up the matter to his supervisor and other executives at NORD/NAE and sought their guidance on many subsequent occasions, because he was concerned that the matter was not being appropriately addressed by NORD/NAE.

35.     The New York School, through its then Head of Health and Safety, Charlotte Jack ("Jack") conducted an investigation of the abuse claims.

36.     Upon information and belief, Jack herself also made a report to the New York State Central Registry on or about June 15, 2015.

37.     In the course of the investigation AA admitted to Jack and to others that her son BB had sexually abused Lufuluabo's son and stated that BB had done so because he had himself been sexually abused in the UK.

38.     In a report dated July 10, 2015 memorializing the investigation (the "Jack Report"), Jack criticized Nord Anglia's handling of the situation, stating, *inter alia*: "[BB]

and [AA] could pose a serious future liability to the company and other children without these two allegations of sexual misconduct addressed."

39. The Jack Report also raised other issues with respect to the New York School's lack of medical records for BB, and other violations of New York law by the New York School.

40. After Wilkinson was advised of the sexual abuse and over the course of the following year, he continued to follow up with officers at Nord Anglia, specifically Graves, Padilla, Duffield, McPhee, and Nicky Duggan-Redfern, NAE Head of Human Resources ("Duggan-Redfern") asking for guidance and assistance in addressing the sexual abuse as well as the other issues raised in the Jack Report.

41. Along with Graves, Padilla, Duffield, McPhee and Duggan-Redfern, Ben Fryer, Esq., ("Fryer") who is upon information and belief counsel for NORD and/or NAE, was also aware of and involved in the investigation process, and was among those with whom Wilkinson consulted about how to handle the sexual abuse and the issues raised in the Jack Report.

42. When Wilkinson asked Fryer if he was aware of the sexual abuse complaint, Fryer admitted that he was – both orally and in email -- and stated "I think we have a plan" for handling it.

43. Wilkinson was not made privy to this "plan", nor was he provided with the requested guidance with how to handle the incident appropriately and in compliance with NY law.

44.    The only instruction Wilkinson received, which was from Padilla and McPhee, was to refer to the abuse as "alleged." This was despite the fact that BB stated that AA had confessed to the abuse.

45.    Upon information and belief, not only was this terminology in denial of the admissions BB had made that were contained in the Jack Report and other documents, it was contrary to the sexual abuse policy that had been used by the World Class Learning Academy (predecessor of the New York School), which stated that children who made sexual abuse claims were to be believed.

46.    Wilkinson was repeatedly berated by Padilla, McPhee, and later Duggan-Redfern for his attempts at following up on the sexual abuse incident and the Jack Report, and was told to stop mentioning the matter.

47.    Duggan-Redfern claimed that Wilkinson's efforts at following up on the sexual abuse "after you were told to stop talking about it" were a flaw in his performance.

48.    On or about January 7, 2016, Jasmine Rosa ("Rosa") told Wilkinson that while preparing an insurance application for the New York School, she saw that there was a question asking if there had been any incident of sexual abuse at the school.

49.    Rosa told Wilkinson that an officer of NORD/NAE had instructed her not to make any reference to the recent sexual abuse claim made by Lufuluabo and BB.

50.    Wilkinson advised Rosa to fill out the form accurately and honestly, and to disclose that there had been a recent claim of sexual abuse.

51.    In or about April 2016, almost one year after Lufuluabo had complained to Wilkinson (and others) of the sexual abuse, she sent an email to Wilkinson, Padilla, and Justine Bricheno ("Bricheno"), Jack's successor as Health and Safety Representative.

52.    Lufululuabo's email complained, *inter alia*, about the lack of action by the New York School and about the apparent failure to believe BB's statements and take serious action in connection with the sexual abuse.

53.    After receiving this email, Padilla had a conference call with Wilkinson and Bricheno.

54.    Upon information and belief, the New York School took no further action with respect to Lufuluabo's complaint.

55.    Upon information and belief, the New York School's failure to take action with respect to Lufuluabo's complaint was due to racial bias.

56.    On or about October 28, 2016, Lufuluabo commenced her own action against *inter alia* NORD, NAE and the New York School.


Misstatements to U.S. Immigration Authorities

57.    On or about June 1, 2015, Wilkinson learned that the employment of Martin Cook ("Cook"), who held the position of Business Manager at the New York School, had been formally terminated.

58.    Upon information and belief, Cook, who was not a U.S. citizen, but who had held a "E" Visa in connection with his employment at the New York School, departed the U.S. on or about July 1, 2015.

59.     On or about July 7, 2015, Cook told Wilkinson that he had been advised to re-enter the U.S. using a tourist visa so he could continue working for Nord Anglia for an additional period of time.

60.     Cook also told Wilkinson that he had been advised by an attorney retained by (upon information and belief) NAE and/or NORD about the answers he should give U.S. immigration officials if he were to be questioned in connection with his re-entry.

61.     Upon information and belief, Cook was advised by NAE and/or NORD to make misstatements to ICE and other governmental officials in order to re-enter the U.S.

62.     Cook told Wilkinson that he believed this to be in violation of the law and that he had made a complaint to Duggan-Redfern.

63.     Wilkinson also complained to Duggan-Redfern about the way in which NORD/NAE had handled Cook's visa status.

64.     Wilkinson also mentioned to Duggan-Redfern that a similar issue had arisen with respect to Susan James, the former North American Director of Finance, who had also told Wilkinson that she had been advised by NAE and/or NORD to misrepresent the nature of her trips to the U.S. by using a tourist visa while actually continuing to work for the New York School.

65.     Wilkinson consulted with an outside attorney who advised him that the manner in which Cook continued to work for the New York School under a tourist visa was a violation of the law.

-10-

66.     Duggan-Redfern told Wilkinson that she had investigated the matter, found the New York School's actions to be legitimate, and refused to take any action in the matter.

Financial Improprieties

67.     During Wilkinson's time at the Hungarian School, Wilkinson became aware that employees of the Hungarian School were being paid a nominal portion of their salaries in Hungary, but were paid least two-thirds of their total salaries through NAE's off-shore accounts.

68.     Upon information and belief, the reason for this salary structure was to lower NAE's salary costs in Hungary, by lowering, *inter alia*, the taxes NAE was required to pay the Hungarian government for each employee.

69.     Upon information and belief, NAE made misrepresentations to the Hungarian government by misstating the amount of employee salaries it was paying, which resulted in NAE failing to pay the proper amount of taxes and other fees due to that government for a period of approximately 10 years.

70.     On or about June 1, 2015, Wilkinson reported these financial improprieties to and questioned Balazs Szegedi ("Szegedi"), the former Finance Manager of the Hungarian School, who subsequently became NAE's European Finance Director.

71.     Upon information and belief, Szegedi had authority to investigate, discover or terminate the misconduct.

72.     In this conversation Szegedi told Wilkinson that NAE's actions had violated the law, and went on to say "the company runs a risk [of liability], especially until 2020".

Complaints of Discrimination

73.     At the time Lufuluabo was hired, she was only the third African-American employee at the New York School (the two other employees were janitors) and her son was the only African-American student.

74.     In October 2014, Lufuluabo undertook marketing duties for the New York School, at Padilla's request. This was in addition to admissions responsibilities that Lufuluabo had also assumed to assist Diaz-Imbelli.

75.     Wilkinson then promoted Lufuluabo to the position of Admission, Marketing Representative, with the knowledge and consent of Padilla and other NORD/NAE executives.

76.     In the course of a discussion between Wilkinson, Lufuluabo, Cook and Hunt in October 2014, it was agreed that both Lufuluabo and Hunt (who had also assumed additional responsibilities in connection with admissions at the New York School) would receive additional compensation for their additional duties.

77.     In keeping with her marketing responsibilities, Lufuluabo attended the NAE North American Conference ("Conference") in Washington, D.C. in November 2014.

78.     After attending the 2014 Conference, Lufuluabo expressed her concerns to Wilkinson about the lack of diversity within the senior leadership of NAE and/or NORD, and the resulting attitudes of staff.

79. The following year, McPhee expressly instructed Wilkinson that Lufulu-abo not attend the next annual Conference.

80. When Wilkinson conveyed Lufuluabo's concerns about the lack of diversity McPhee stated that all North American Schools would receive appropriate diversity awareness training, and appointed Bricheno to head diversity training at the New York School.

81. Wilkinson observed Graves coming up to Lufuluabo after meetings in which Lufuluabo had taken part as part of her marketing responsibilities and condescendingly telling her "Thank you for the catering".

82. Lufuluabo complained to Wilkinson that Bricheno made racially derogatory comments to her, including but not limited to comments about Lufuluabo's choice of an ethnic hairstyle.

83. No diversity awareness training was ever provided at the New York School.

84. Wilkinson repeatedly complained to officials at the New York School that Lufuluabo was being treated differently by employees and managers at the school because of her race.

85. During Fall 2015, representatives of NORD repeatedly questioned Wilkinson about Lufuluabo's child having a merit scholarship to attend the New York School.

86. Upon information and belief, no such complaints were made about other students who were recipients of merit scholarships.

-13-

87.    Upon information and belief, representatives of NORD/NAE, including but not limited to McPhee, repeatedly questioned Lufuluabo's job description and her qualifications because of her race.

88.    When Wilkinson provided McPhee with a copy of Lufuluabo's job description, McPhee insisted that the job description must belong to another employee.

89.    The regularity and number of queries Wilkinson received about Lufuluabo's job at the New York School caused Wilkinson to believe they were racially motivated.

90.    Representatives of NORD repeatedly questioned Wilkinson about when Lufuluabo would be leaving the employ of the New York School.

91.    Both Padilla and Lufuluabo told Wilkinson that Padilla had repeatedly asked Lufuluabo when she would be leaving the New York School,

92.    Wilkinson asked Padilla to cease and desist, because such questioning was inappropriate, and beacause she was disturbing Lufuluabo and noticeably treating her differently from other similarly-situated employees.

93.    Upon information and belief, in or about October 2015, Padilla approached Rosa (who was the only other African-American employee of the New York School at that time) and asked her if Lufuluabo and Wilkinson were having a sexual relationship.

94.    Upon information and belief, both Rosa and Lufuluabo believed that these insinuations and the questioning of Rosa were racially motivated.

95.    In or about March 2016, Rosa resigned from her employment at the New York School.

96.     Upon information and belief, Rosa subsequently filed a complaint with the NYS Department of Labor in connection with her employment at the New York School.

97.     When Lufuluabo did not receive the agreed upon pay increase, she approached Wilkinson and Rosa and the three agreed that $10,000 would be reallocated from the receptionist's salary and added to Lufuluabo's salary.

98.     Upon information and belief, Hunt, a White teacher, did receive the agreed upon additional compensation.

99.     When Lufuluabo still did not receive the pay increase, she approached Bricheno, who told her to approach McPhee.

100.    One week after Lufuluabo did so, her employment was terminated.

101.    Upon information and belief, on or about June 23, 2016, the New York School terminated the employment of Lufuluabo with no notice. Upon information and belief, there was no valid business justification for this termination.


Reporting Issues with Building Safety

102.    Upon information and belief, when NORD/NAE purchased the New York School, they retained the services of the building's original architect to renovate the building in compliance with New York (the "Renovations").

103.    Upon information and belief, NAE and/or NORD used the services of Tom Palermo ("Palermo") as Project Manager for the Renovations.

104.    Upon information and belief, Palermo reported directly to either Ed Schmidt, the Nord Anglia Project Director North America, or to the Nord Anglia Managing Director North America.

105.    Palermo made Wilkinson became aware that there were problems with the construction of certain elements of the Renovations which potentially caused a health and safety risk to students and employees at the New York School.

106.    Palermo expressed concern to Wilkinson that NORD/NAE was not undertaking the full building renovation that was indicated by the architect's plans, which had been submitted and approved by the New York City Department of Buildings.

107.    Wilkinson, together with Palermo, repeatedly brought these issues and the concomitant risks to health and safety to the attention of NORD and NAE management.

108.    NORD and/or NAE failed to authorize the additional construction needed to ensure that the Renovations did not cause a risk to the health and safety of those on the New York School's premises.

Termination of Wilkinson's Employment

109.    In April 2016, Wilkinson sent Duggan-Redfern expressing a number of concerns he had the New York School, including but not limited to the mishandling of the sexual abuse claim and his allegations of discrimination.

110.    In Wilkinson's conversations with her about this matter, Duggan-Redfern repeatedly referred to Wilkinson as a "whistleblower."

-16-

111.   It was during these conversations that Duggan-Redfern suggested that Wilkinson's employment at the New York School should come to an end.

112.   On several occasions, Duggan-Redfern suggested that Wilkinson take six months' paid leave from the New York School and subsequently move to a senior position at another NAE school.

113.   In Duggan-Redfern's penultimate conversation with Wilkinson, she told him that Fitzmaurice wanted Wilkinson to remain at the New York School, that suitable measures would be undertaken to facilitate this. Wilkinson agreed to this proposal.

114.   Upon information and belief, McPhee stated to Duggan-Redfern and others at NORD/NAE that she did not want to continue working with Wilkinson.

115.   Throughout the course of several discussions, Duggan-Redfern and Wilkinson, and Wilkinson and Johnny Dowd, NAE Head of Integration ("Dowd"), agreed that Wilkinson would receive three months paid "administrative leave" until his employment ended on September 22, 2016, and would receive an additional six months' severance on that date as required pursuant to the Employment Letter.   It was also agreed that Wilkinson would receive a favorable recommendation from Nord Anglia.

116.   At no point in these discussions did Duggan-Redfern or Dowd suggest that there was cause for the termination of Wilkinson's employment.

117.   Wilkinson was so popular with the parents at the New York School that 86 parents (out of approximately 107 families) signed a letter protesting his departure.

118.   On June 23, 2016, the final day of the term, Dowd met with Wilkinson and told him that his employment at the New York School had been terminated.

119.   Wilkinson asked have an attorney join him at the meeting, but Dowd refused.

120.   Dowd offered Wilkinson a separation agreement which he demanded Wilkinson sign immediately, or else his employment would be terminated for cause.

121.   Wilkinson refused to sign the proposed agreement, and was given 15 minutes to leave the premises of the New York School. This created the false impression to parents and other individuals that Wilkinson was guilty of some act of wrongdoing.

122.   In a notice dated June 23, 2016 (the "Notice"), the New York School falsely stated that Wilkinson had "stepped down" from his position at the New York School.

123.   Upon information and belief, when parents questioned McPhee after receiving the Notice, McPhee stated falsely that Wilkinson's employment had been terminated for cause.

124.   Upon information and belief, Nord Anglia's stated reasons for terminating Wilkinson's employment (and the manner in which his employment was terminated were pretextual.

Defamation

125.   In or about September 2016, Wilkinson became aware that representatives of Nord Anglia, including but not limited to Richard Davies and John Does 1-5, had made

wrongful and false statements and insinuations to third parties that Wilkinson had "embezzled over a million dollars" from the New York School and/or Nord Anglia, or words to that effect.

126.     In or about September 2016, Wilkinson became aware that representatives of Nord Anglia, including but not limited to John Does 1-5, had made wrongful and false statements and insinuations to third parties that Wilkinson and others had "made up the story of the sexual abuse" of BB, or words to that effect, and that no such abuse had ever taken place.

## COUNT I

## (BREACH OF CONTRACT)

127.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

128.     Pursuant to the terms of the Letter Agreement, Wilkinson was entitled to receive six months' notice of the termination of his employment.

129.     Wilkinson received no notice of the termination of his employment, in violation of the Letter Agreement.

130.     Pursuant to the terms of the Letter Agreement, Wilkinson was entitled to receive 40 days of paid vacation annually.

131.     During his employment at the New York School, Wilkinson only received approximately 10 days paid vacation over the course of three years, instead of the 120 days to which he was entitled each year.

132.     During the last year of his employment at the New York School, Wilkinson only received 10 days of paid vacation.

133.   As a result of the foregoing, Nord Anglia has breached the Employment Agreement.

134.   Plaintiff is therefore entitled to recover damages in an amount to be determined at trial.

## COUNT II

### (BREACH OF ORAL AGREEMENT)

135.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

136.   As a result of the foregoing, Nord Anglia has breached the oral agreement between Wilkinson and Duggan-Redfern.

137.   Plaintiff is therefore entitled to recover damages in an amount to be determined at trial, but no less than $120,000.

## COUNT III

### (DEFAMATION)

138.   Plaintiff repeats and realleges the allegations contained in paragraphs numbered 1 through 127 above as if herein set forth in full.

139.   In making the statements in paragraphs 126-127, Defendants purported to be making statements of fact.

140.   Each of these statements by Defendants was false, libelous and/or slanderous and defamatory and constituted defamation per se. Defendants intended to cause members of the public and in his professional environment to believe that plaintiff was, without limitation, dishonest, liable for criminal conduct, negligent, and unfit to perform his profession.

141.   The false and derogatory statements about plaintiff tend to expose plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and deprive him of friendly association in society. In the communities in which he works and performs, plaintiff has been injured in his reputation and good-standing, and has been held up to ridicule and contempt by family, friends, acquaintances, neighbors and the public in general.

142.   The statements Defendants have made about plaintiff were calculated to injure plaintiff in his profession, trade or business by imputing to him traits that, if true, would render him unfit to publicly perform him profession.

143.   By reason of the foregoing plaintiff has suffered general and special damages in an amount to be determined at trial, including damage to plaintiff's reputation and standing in the community, shame, mortification, hurt feelings, embarrassment, humiliation, damage to peace of mind, emotional distress, and injury in his occupation.

144.   Defendants' conduct, as alleged above, has involved such a high degree of moral culpability that there should be an award of punitive damages in an amount to be determined at trial.

<u>COUNT IV</u>

-21-

(RETALIATION FOR DISCRIMINATION COMPLAINTS UNDER TITLE VII)

145.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

146.   Upon information and belief, Nord Anglia terminated Plaintiff's employment in retaliation for making complaints about and criticizing Nord Anglia's discriminatory behavior, in violation of Title VII of the Civil Rights Act 42 U.S.C.  § 2000e-3(a) et seq.

147.   As a result of the foregoing, Plaintiff has been damaged by Nord Anglia's acts in violation of Title VII.

148.   On or about November 29, 2016, Wilkinson filed a Charge with the Equal Employment Opportunity Commission ("EEOC").

149.   On or about June 19, 2017, the EEOC issued a Final Determination ("Final Determination") stating that "the Commission's investigation shows that [Nord Anglia's] reason for discharging [Wilkinson] is a pretext to hide retaliation. Based upon the more likely than not standard, [Wilkinson] was retaliated against for engaging in protected activity, when [Nord Anglia] subjected him to the adverse action of discharge, in violation of Title VII."

150.   The Final Determination went on to state "[h]aving determined that there is reason to believe that violations have occurred, the Commission now invites [Nord Anglia] to join with it in an effort toward a just resolution of this matter," and instructed Nord Anglia to respond within ten days of the date of the Final Determination.

151.   Nord Anglia failed to respond to the EEOC's efforts at conciliation.

152.   On or about July 12, 2017, the EEOC stated that its efforts at conciliation had failed and issued a right to sue letter permitting this claim to be brought in Federal Court.

-22-

153.    Plaintiff is therefore entitled to receive damages an amount to be determined at trial.

154.    Plaintiff is also entitled to receive attorneys' fees under Title VII.


## COUNT V

### (RETALIATION FOR DISCRIMINATION COMPLAINTS UNDER NEW YORK STATE HUMAN RIGHTS LAW)

155.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

156.    Upon information and belief, Nord Anglia terminated Plaintiff's employment in retaliation for making complaints about and criticizing Nord Anglia's discriminatory behavior, in violation of NY State Human Rights Law Executive Law Article 15 § 296 ("NYSHRL").

157.    As a result of the foregoing, Plaintiff has been damaged by Nord Anglia's acts in violation of NYSHRL.

158.    Plaintiff is therefore entitled to receive damages an amount to be determined at trial.


## COUNT V

### (RETALIATION FOR DISCRIMINATION COMPLAINTS UNDER NEW YORK CITY HUMAN RIGHTS LAW)

159.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

160.    Upon information and belief, Nord Anglia terminated Plaintiff's employment in retaliation for making complaints about and criticizing Nord Anglia's discriminatory behavior, in violation of New York City Human Rights Law 8-101, et seq. ("NYCHR").

161.    As a result of the foregoing, Plaintiff has been damaged by Nord Anglia's acts in violation of New York City Human Rights Law 8-101, et seq.

162.    Plaintiff is therefore entitled to receive damages an amount to be determined at trial.

## COUNT VI

### (RETALIATION FOR MAKING COMPLAINTS
### ABOUT SEXUAL ABUSE OF A CHILD)

163.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

164.    Wilkinson's reporting of Lufuluabo and BB's claims that sexual abuse had occurred on the premises of the New York School was not only protected under New York law, it was required.

165.    Upon information and belief, Wilkinson's employment was terminated because of this report.

166.    Upon information and belief, the termination of Wilkinson's employment is an adverse employment action in violation of the policy and Employee Handbook of the World Class Learning Group and/or Nord Anglia.

167.    The termination of Wilkinson's employment is in violation of N.Y. Labor Law §740.

168.   As a result of defendants' actions, Wilkinson has been damaged in an amount to be determined at trial.

## COUNT VII

### (VIOLATION OF N.Y. LABOR LAW)

169.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

170.   Upon information and belief, at a meeting on or about September 15, 2016, parents of students at the New York School expressed concern about the safety of the Renovations, thus demonstrating that Wilkinson had valid reasons for concern.

171.   Wilkinson's complaints about the health and safety risks posed by the construction of the Renovations were protected under NY law.

172.   Upon information and belief, Wilkinson's employment was terminated because he had made complains about this situation.

173.   The termination of Wilkinson's employment is in violation of N.Y. Labor Law  § 740.

174.   As a result of defendants' actions, Wilkinson has been damaged in an amount to be determined at trial.

COUNT VII

(VIOLATIONS OF NY LABOR LAW)

175.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

176.    On or about June 23, 2016, the New York School terminated Plaintiff's employment effective September 23, 2016.

177.    Nord Anglia failed to pay Plaintiff his salary for the period from June 23, 2016 to September 23, 2016.

178.    Nord Anglia also failed to pay Plaintiff for more than 30 paid vacation days which have accrued.

179.    By failing to pay these sums accrued and owing, Nord Anglia has breached New York Labor Law §191.

180.    Plaintiff is therefore entitled to receive damages in an amount to be determined at trial.

COUNT VIII

(RETALIATION FOR WHISTLEBLOWING)

181.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

182.    Upon information and belief, plaintiff's employment was terminated in retaliation for his reporting of financial and other corporate improprieties.

183.    The termination of plaintiff's employment for these reasons is a violation of 42 U.S.C.A. §2000e et seq.

184.    Plaintiff is therefore entitled to receive damages in an amount to be determined at trial.

## COUNT IX

### (ATTORNEYS' FEES UNDER STATE LAW)

185.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

186.    Plaintiff is entitled to recover attorneys' fees under New York Labor Law and NYSHRL.

## COUNT X

### (ATTORNEYS' FEES UNDER CITY LAW)

187.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

188.    Plaintiff is entitled to recover attorneys' fees under NYCHRL .

## COUNT XI

### (CONVERSION)

189.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126 above as if herein set forth in full.

190.    In connection with his work at the New York School, Wilkinson brought and kept certain of his own personal possessions (including but not limited to camera equipment with an estimated value of approximately $5,000) on the premises.

191.    When Wilkinson was told to leave the New York School on June 23, 2016, he was forced to leave these possessions on the premises.

192.    For more than four months, Wilkinson has repeatedly requested that The New York School either return his possessions or permit him to retrieve them.

193.    On or about October 17, 2016, the New York School delivered a portion of Wilkinson's property to the offices of Wilkinson's attorney.

194.    The few cameras that were returned were improperly packed, and only constituted a fraction of the cameras and other possessions belonging to Wilkinson that remain on the premises of the New York School.

195.    The New York School's refusal to return Wilkinson's property or permit him to retrieve it constitutes a conversion of Wilkinson's possessions.

196.    As a result of defendant's actions, Wilkinson has been unjustly deprived of his property and damaged in an amount to be determined at trial, but in no event less than $5,000.

WHEREFORE, Plaintiff prays for judgment:

(a)    Awarding Plaintiff damages for breach of a written contract in an amount to be determined at trial, but no less than $120,000;

-28-

(b)     Awarding Plaintiff damages for breach of an oral agreement in an amount to be determined at trial;

(c)     Awarding Plaintiff damages for defamation in an amount to be determined at trial;

(d)     Awarding Plaintiff damages for retaliating against him for his complaints that defendants engaged in discriminatory behavior in violation of Title VII, in an amount to be determined at trial;

(e)     Awarding Plaintiff damages for retaliating against him for his complaints that defendants engaged in discriminatory behavior in violation of NYSHRL, in an amount to be determined at trial;

(f)     Awarding Plaintiff damages for retaliating against him for his complaints that defendants had engaged in discriminatory behavior in violation of NYCHRL, in an amount to be determined at trial, including but not limited to lost wages and attorneys' fees;

(g)     Awarding Plaintiff damages for retaliating against him for reporting the sexual abuse of a child in violation of NYS Labor Law §740, in an amount to be determined at trial, including compensation for benefits, lost wages, and attorneys' fees;

(h)     Awarding Plaintiff damages for violating NYS Labor Law § 191, in an amount to be determined at trial;

(i)     Attorneys' fees and costs; and

(j)     such other and further relief as the Court may deem just and proper.


Dated:   New York, New York
         September 27, 2017


                                    MENAKER & HERRMANN LLP

                                    By: _____
                                         Cheryl L. Davis

                                    Attorneys for Plaintiff
                                    10 East 40th Street
                                    New York, New York 10016
                                    (212) 545-1900