UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X
:
ALAN WILKINSON,                                              :
:                    17 Civ. 7421 (PAE)
                                     Plaintiff,              :
:                    <u>OPINION & ORDER</u>
             -v-                                            :
:
NORD ANGLIA EDUCATION LTD., et al.,                         :
:
                                     Defendants.           :
:
------------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/30/19

PAUL A. ENGELMAYER, District Judge:

Plaintiff Alan Wilkinson brings this action against defendants Nord Anglia Education

Limited, Nord Anglia Education, Inc., and Nord Anglia International School New York

(collectively, "Nord Anglia" or the "defendants"). Wilkinson served as a principal of the Nord

Anglia International School of New York (formerly known as the World Class Learning

Academy of New York and, hereinafter, the "New York School") from September 1, 2013, to

June 28, 2013, when he was terminated. He alleges that he was terminated in retaliation for

complaining about Nord Anglia's treatment of an African-American employee, in violation of

Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a) *et seq*. ("Title VII"), the New York

State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law

("NYCHRL").[1] Pending now is defendants' motion for summary judgment on Wilkinson's

---

[1] Wilkinson originally brought additional claims, including for violations of state labor law, retaliation for whistleblowing, breach of contract, and defamation. *See* Dkt. 24 (Amended Complaint or "AC") ¶¶ 123–85 (listing claims). He has since voluntarily dismissed all but his first, second, and third causes of action for retaliation under Title VII, the NYSHRL, and the NYCHRL. *See* Dkts. 26, 63, 72. Wilkinson's eighth and ninth claims are for attorneys' fees under state and city law.

claims. Wilkinson opposes defendants' motion, arguing that disputes of material fact preclude an award of summary judgment. For the reasons that follow, the Court denies the motion.

## I. Background[2]

### A. Factual Background

#### 1. The Parties

Nord Anglia Education, Inc. is an international for-profit organization that operates 56 schools in 27 countries around the world. JSF ¶ 1. It operates eight Nord Anglia schools in the United States, including, relevant here, the New York School, located in Manhattan. *Id.* ¶ 2. Nord Anglia is headquartered in Hong Kong. Def. 56.1 ¶ 3. It is managed by CEO Andrew Fitzmaurice, in consultation with the Nord Anglia Executive Committee, which meets

---

[2] The Court draws its account of the facts of this case from the parties' submissions in support of and in opposition to the motion for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 70 ("JSF"); defendants' Local Rule 56.1 statement, Dkt. 74 ("Def. 56.1"); the affidavit of Nandini Rao in support of defendants' motion, Dkt. 75 ("Rao Aff."), and the exhibits attached thereto; the affidavit of Sara Padilla in support of defendants' motion, Dkt. 76 ("Padilla Aff."), and the exhibits attached thereto; Wilkinson's Local Rule 56.1 statement, Dkt. 81 ("Pl. 56.1"); the declaration of Jasmine Rosa in opposition to the motion, Dkt. 82 ("Rosa Decl.") and the exhibits attached thereto; the declaration of Alan Wilkinson in opposition to the motion, Dkt. 83 ("Wilkinson Decl."), and the exhibits attached thereto; the declaration of Theodor D.E. Bruening in opposition to the motion, Dkt. 84 ("Bruening Decl."), and exhibits attached thereto; the declaration of Tshinguta "Lily" Lufuluabo in opposition, Dkt. 85 ("Lufuluabo Decl."), and the exhibits attached thereto; defendants' response to Wilkinson's Rule 56.1 statement, Dkt. 86 ("Def. Reply 56.1"); and the affidavit of Neil G. Sparber in further support of defendants' motion, Dkt. 88 ("Sparber Reply Aff."), and the exhibits attached thereto.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

approximately 10 times per year. *Id.* Nicky Duggan Redfern is the Chief Human Resources Officer for Nord Anglia at the global level and is a member of the Executive Committee. *Id.* ¶ 5. Ann McPhee is the Regional Managing Director of the Americas for Nord Anglia. *Id.* ¶ 6. Her predecessor in this position, David Graves, served as the Regional Managing Director between March 2014 and January 2016. *Id.* ¶ 7. Sara Padilla is the Human Resources Director of the Americas for Nord Anglia.

Wilkinson, a citizen of the United Kingdom, served as principal of the New York School from September 1, 2013, to June 23, 2016, when he was involuntarily terminated. JSF ¶¶ 4–5, 27. Wilkinson had been employed by various of the defendants since 2003 as a teacher and vice-principal in other schools. *Id.* ¶ 6. By the time Wilkinson was hired at the New York School, he had 20 years experience, including more than a decade's service as head of another Nord Anglia school. Wilkinson Decl. ¶ 5. The principals of the Nord Anglia U.S. schools report directly to their respective regional managing directors, and the regional managing directors in turn report to Fitzmaurice. Def. 56.1 ¶ 9.

### 2. Wilkinson's Employment at the New York School

#### a. The Hiring of Lily Lufuluabo

Wilkinson began working as principal of the New York School in September 2013. Wilkinson, who is Caucasian, states that when he first started as principal, the New York School employed few African-Americans in non-janitorial positions, and there were few non-white students in attendance. Pl. 56.1 ¶ E. On August 10, 2014, after approximately one year as principal, Wilkinson hired Tshinguta "Lily" Lufuluabo, an African-American, as a receptionist and personal assistant. JSF ¶ 9–10. In October 2014, Lufuluabo's responsibilities were expanded to include work related to marketing and admissions. *Id.* ¶ 11.

3

In August 2014, Wilkinson offered Lufuluabo's son—also African-American—a one-year scholarship at the New York School. *Id.* ¶¶ 12–13. For the 2014–15 academic year, the New York School was authorized to extend two scholarships to students. Def. 56.1 ¶ 20. The two scholarships were earmarked for female students; to offer a scholarship to a male student, Wilkinson required the approval of Graves, his manager. *Id.* ¶ 22. The parties dispute whether Wilkinson obtained supervisory approval to extend a scholarship to Lufuluabo's son. *Compare* Def. 56.1 ¶ 24 *with* Pl. 56.1 at 10–11.

### b.   Wilkinson's Performance From 2013 to April 2015

During the 2013–14 academic year, Graves served as Managing Director of North America for Nord Anglia. As such, he was Wilkinson's immediate supervisor. Def. 56.1 ¶ 25. On December 2, 2014, Wilkinson received his performance evaluation from David Graves for the 2013–14 academic year. *Id.* ¶ 26. The evaluation scale ranges from a score of "1," for "outstanding" performance, to "4" for "needs improvement." Rao Decl. Ex. H ("2013–14 Evaluation") at 6. For the 2013–14 academic year, Graves proposed giving Wilkinson the second-lowest score of "3," for a "developing" performance. *Id.* at 8.

A March 2015 document entitled "Executive Committee Report: North America, March 2015" ("March 2015 Report"), states, with respect to the New York School, "As a result of the many issues at the school, the regional team conducted an intensive session with [Wilkinson]. This included an HR review as well as marketing/admissions review. We will be developing a new strategic plan and are likely to propose a change of leadership at the school, with primary focus on changing both the business manager and the Principal." Def. 56.1 ¶ 31.[3]

---

[3] Wilkinson objects to consideration of this document, arguing that it is inadmissible hearsay and not a reliable record of a regularly conducted activity, and that it is "suspect." Pl. 56.1 at 13. Because a party "cannot rely on inadmissible hearsay" in support of or in opposition to a motion

During Graves' tenure as Wilkinson's manager, from 2013 to 2015, Graves and CEO Fitzmaurice spoke every two weeks about the regional principals working under Graves, including Wilkinson. Def. 56.1 ¶¶ 41–43. The parties dispute whether Graves and Fitzmaurice discussed, in these meetings, whether Wilkinson should be removed from his position as principal of the New York School. Pl. 56.1 at 17.

### c. April 2015 Alleged Abuse Incident

In April 2015, Lufuluabo informed Wilkinson that her son had discussed being abused by another student at the New York School. JSF ¶ 14. The child accused of the abuse was the son of another teacher at the school. Def. 56.1 ¶ 33. After learning of this alleged abuse, Wilkinson informed the relevant state authorities and contacted his manager, Graves, and the Nord Anglia Human Resources Director, Sara Padilla. JSF ¶ 15. Wilkinson testified that defendants' regional managers did not express serious concern for Lufuluabo's son or the need to prevent future such incidents. Pl. 56.1 ¶ G. Wilkinson arranged to keep the children separate from each other. *Id.* ¶ H. The parties agree that Wilkinson followed proper protocol with respect to this incident. Def. 56.1 ¶ 39.

In June 2015, Charlotte Jack, a teacher at the New York School in charge of health and safety matters, prepared a report regarding the alleged assault (the "Jack Report"). JSF ¶ 17. It recommended that the child who allegedly engaged in abusive conduct not be permitted to return

---

for summary judgment, "the Court must, as a preliminary matter, determine the likely admissibility of the hearsay evidence" offered by defendants. *Doe ex rel. Doe v. Darien Bd. Of Educ.*, 110 F. Supp. 3d 386, 395 (D. Conn. 2015) (internal quotation marks omitted). As defendants' counsel, Neil G. Sparber, avers in his sworn affidavit, summaries of Executive Committee meetings, including the March 2015 Report, are regularly "prepared after each Executive Committee meeting in the ordinary course of business." Sparber Reply Aff. ¶ 21. Wilkinson does not adduce evidence to dispute that contention or to support his claim that the document is suspect. The Court therefore concludes that the March 2015 Report, and other summaries of Executive Committee meetings, are likely admissible under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6).

to the New York School for the 2015–16 academic year without first receiving psychological counseling. Pl. 56.1 ¶ H. However, at the end of the 2014–15 school year, Lufuluabo complained that the alleged abuse her son had suffered had not been adequately addressed. *Id.* ¶ I. Wilkinson met with Nord Anglia regional managers, including Padilla. *Id.* Padilla informed Wilkinson to keep the incident "off email." *Id.* Padilla testified that she told Wilkinson not to discuss the matter on email because she learned that Lufuluabo had access to Wilkinson's emails, and Padilla felt it would be inappropriate to discuss Lufuluabo in emails that Lufuluabo could read. Bruening Decl. Ex 16 ("Padilla Dep.") at 378–79.

Both students involved in the April 2015 incident returned to the New York School for the 2015–16 academic year. Pl. 56.1 ¶ J. Wilkinson states that he repeatedly asked Nord Anglia's regional management and legal counsel about the incident and was advised that Nord Anglia had a "plan" in place to address the issue. *Id.* He states that the plan was never articulated to him. *Id.*

On September 10, 2015, shortly after the 2015–16 school year began, Lufuluabo complained to Wilkinson, Jack, and other Nord Anglia employees that Nord Anglia had not taken any action to assure that the abusive conduct would not be repeated. *Id.* ¶ K. Lufuluabo further complained that the mother of the allegedly offending student had claimed that her son had received psychological counseling when he had in fact not received any such counseling. *Id.* Wilkinson conveyed Lufuluabo's concerns to Nord Anglia regional management. *Id.* ¶ L.

### d. Executive Committee Summaries in August to September 2015 and the September 2015 "Talent Profile"

In August and September 2015, Nord Anglia documented certain performance issues associated with the New York School. An August 2015 Executive Committee Report ("August 2015 Report") recorded that "[c]oncerns regarding the leadership of the [New York School]

continue." Def. 56.1 ¶ 44. The September 2015 Executive Committee Report contained an identical notation. *Id.* ¶ 45. It further stated "New Business Manager training underway. She has raised concerns about the school's leadership, priorities, and generally her role." *Id.*[4]

On September 29, 2015, Padilla sent Graves, Wilkinson's immediate supervisor, an email containing an attached "Talent Profile" for Wilkinson (the "Talent Profile" or "Profile").[5] With respect to the section entitled "Competency Area Accountable," the Profile states that Wilkinson was "Developing" and that he "continues to struggle with understanding the metrics of the business, such as budget, enrollment, etc." Def. 56.1 ¶ 52. With respect to a section entitled "Competency Area Enabling," the Profile states that Wilkinson "finds challenge with difficult staff conversations and therefore the performance of staff and deadlines have suffered." *Id.* ¶ 53. With respect to a section entitled "Competency Area Agile," the Profile scores Wilkinson as "Needs Improvement" and states that "[w]hile numbers appear to have improve[d] slightly, Alan faces many of the same unresolved issues year after year." *Id.* ¶ 54. In a section entitled

---

[4] Wilkinson again objects to defendants' reliance on Executive Committee Reports, arguing that such reports are hearsay. As noted above, the Court concludes that such Reports are likely admissible under the business records exception to the hearsay rule.

[5] Wilkinson argues that the Talent Profile is "unreliable and may be fraudulent. Analysis of the document's metadata has shown that it was altered after the commencement of this action." Pl. 56.1 at 17–18. The Court does not find substantiation for this claim. Wilkinson produces no evidence that the document is fraudulent. Defendants' counsel, Neil Sparber, denies this allegation in his sworn affidavit. And, significantly, plaintiff's counsel questioned various witnesses about the Talent Profile, including its author, Graves. Graves testified as follows:

> Q: Under career aspirations on the last page. Career aspirations next steps. It says here, "It is likely Alan will be removed from post within 12 months."
> A: Right. That was my conclusion on [Wilkinson].
> Q: Okay. Why did you put that in there?
> A: Because [Wilkinson] was underperforming.

Rao Aff. Ex. D ("Graves Dep.") at 206. Graves further testified that he worked off a template Talent Profile and filled in the template, and that statements contained within are attributable to him. Graves' sworn testimony is consistent with the contents of the Talent Profile.

"Competency Area Resilient," the Profile states: "Needs Improvement" and "Alan's resilience is low, he needs to persist in solving issues, doesn't progress challenges appropriately, relies on and lacks understanding of the support available." *Id.* ¶ 55. In a section that states "Overall performance rating 2014/15," the Profile states: "Developing." *Id.* ¶ 56. In a section entitled "Career aspirations / Next steps / Any role extra responsibilities you have in mind," the Profile states "It is likely Alan will be removed from post within 12 months." *Id.* ¶ 57. Wilkinson states that Graves did not explicitly warn him he could be removed within 12 months if his performance did not improve. Pl. 56.1 at 20.

Around this same time, Wilkinson avers that he was becoming increasingly concerned about Nord Anglia's handling of Lufuluabo's abuse allegation and believed management's resistance to remedial action stemmed from racial animus. Pl. 56.1 ¶ M. He did not complain of such discrimination to his managers at this time. *Id.*

Also around the fall 2015, Graves left Nord Anglia and Ann McPhee became Wilkinson's immediate supervisor. JSF ¶ 20. In November 2016, McPhee questioned Wilkinson about "what [Lufuluabo] does" at the New York School and asked Wilkinson to provide Lufuluabo's job description. Def. 56.1 ¶ 60. Wilkinson felt that these questions were inappropriate and that McPhee was singling Lufuluabo out due to her race. *Id.* ¶ 61. Wilkinson did not ask McPhee why McPhee was asking such questions. *Id.* ¶ 62.

### e.    February 25, 2016 Recording

On February 25, 2016, Padilla and McPhee visited the New York School. *Id.* ¶ 64. On February 25, 2016, plaintiff recorded conversations involving Padilla, McPhee, and others using an iPhone, without obtaining their consent ("February 25, 2016 Recording"). Wilkinson contends that his recording was inadvertent. Pl. 56.1 at 22. Wilkinson provided what he

contends is an accurate transcript of the recording, many portions of which are designated as inaudible. Wilkinson Decl. Ex. 31 ("February 25, 2016 Tr."). The transcript largely captures Padilla's end of a telephone conversation. In it, Padilla states that "we"—an apparent reference to Nord Anglia—would have difficulty "get[ting] a quality head to come here to rebuild that foundation," and would have to "get the foundation rebuilt . . . and then hire a quality head to come . . . ." *Id.* at 6–7. Padilla also appears to state "I wouldn't necessarily keep him. But I would suggest that we figure out a way to cover it." *Id.* at 7. Although Padilla appears to be referencing problems at the New York School, the context of the conversation is unclear.

### f.     April 2016 – June 2016

Several months later, on April 6, 2016, Lufuluabo sent an email to Padilla complaining about racial discrimination. *Id.* ¶ P. Lufuluabo wrote that she felt her allegation of abuse was "[swept] under the rug," that she had witnessed "minor incidents treated with more concern," and that she felt she and her son were "being discriminated against because of our race." Wilkinson Decl. Ex. 16 ("April 6, 2015 Correspondence") at 3. Shortly after receiving that email, Padilla emailed Wilkinson and Justine Bricheno, then the New York School's health and safety director, to schedule a conference call regarding Lufuluabo's complaint. *Id.* Wilkinson states that during the April 6, 2015 conference call, he supported Lufuluabo's complaints of racial discrimination. *Id.* As discussed further below, defendants dispute this and contend that Wilkinson did not complain of, or support Lufuluabo's complaint of, racial discrimination on that call. Def. Reply 56.1 at 13–14.

At some unknown period, but before April 18, 2016, Wilkinson discovered a notebook in his office belonging to Padilla. JSF ¶ 23. Wilkinson reviewed the notebook and came across

notes suggesting "movement" involving Nord Anglia principals. Def. 56.1 ¶ 72. Wilkinson

observed a question mark near his name. *Id.* ¶ 73; Rao Decl. Ex. U ("Padilla Notes").

Later, on April 18, 2016, Wilkinson sent an email to Nicky Duggan Redfern, the Chief

Human Resources Officer for Nord Anglia. *See* Rao Aff. Ex. W ("4/18/16 Email"). In it,

Wilkinson registers his "formal[] complain[t] about a number of issues that have arisen" with

respect to Padilla and McPhee. The email, which is approximately six single-spaced pages in

length, details a number of Wilkinson's complaints regarding his perceived treatment by Nord

Anglia managers. Chief among his complaints is Nord Anglia's handling of Lufuluabo's abuse

allegation. Relevant here, Wilkinson writes:

> I was visited by [Padilla] in company with [another employee], around
> April of last year—post the [abuse] incident described above. They appeared to
> have come on a formal visit to the school . . . . Wherein I felt I was being
> interrogated. With regard to the sexual assault, needless to say I wanted to
> discuss the ramifications. [Padilla] literally informed me that I was culpable for
> anything that occurred on the school premises. There was no offer of further
> assistance. However, I was quizzed far more comprehensively as to why the
> victim had been accepted as a scholarship child. To which I explained the
> circumstances—with especial emphasis on our lack of diversity—and this child,
> who is undoubtedly an intelligent child, being our only African-American student.
> I was also interrogated (I use the word advisedly) about the position his mother
> held in the school. I explained what she did—which patently is much in a small
> school. However, why I was being quizzed about these matters, I have no clue–
> especially as it was [Padilla] herself who met the mother and both discussed and
> requested that she undertake the position she was holding . . . . Their relationship
> to the sexual assault appears specious at best.
>
> The issue of the mother concerned—Lily Lufuluabo has been referred to
> perpetually over the last year by [Padilla] and [McPhee]. Lily had told me that
> she was considering other jobs a few months after accepting ours. I had
> mentioned this to [Padilla] . . . on the basis that they should be aware that I may
> be without an essential member of staff. However, I would describe [Padilla] as
> being infatuated with Lily's potential leaving—she had never shown such
> ongoing interest in any other member of staff. She continued asking Lily when
> she was going to leave—in fact, so frequently, that I spoke to [Padilla] and
> suggested that she should desist from this questionning [sic] her any more on the
> subject—as it felt inappropriate—especially as she only began asking after being
> informed of the incident mentioned above, ergo [Padilla's] motives looked

extremely questionable. Similarly, [McPhee] in company with [Padilla] has asked so many times about Lily—regardless of my despatching [sic] a comprehensive job description. To reiterate, it was [Padilla] who met with Lily to discuss and literally persuade her to take the job of assisting with admissions.

4/18/16 Email at 3.

Thereafter, on June 23, 2016, Wilkinson met with John Dowd, the Head of Integration for Nord Anglia, and was placed on administrative leave. JSF ¶ 27. On June 29, 2016, Nord Anglia terminated Wilkinson for cause. *Id.* ¶ 27.

## B. Procedural History

On September 28, 2017, Wilkinson filed the Complaint in this action. Dkt. 1. On December 18, 2017, defendants filed a motion to dismiss certain claims. Dkt. 18. On December 21, 2017, the Court ordered that Wilkinson filed any amended complaint, or otherwise oppose the motion to dismiss, by January 8, 2018. Dkt. 21. On February 7, 2018, after an extension, Wilkinson filed his Amended Complaint. Dkt. 24. On February 26, 2018, the Court held an initial conference. On March 2, 2018, the parties stipulated that defendants would answer the Amended Complaint by March 9, 2018. Dkt. 30. On March 9, 2018, defendants answered. Dkt. 32. On May 17, 2018, the parties stipulated to the dismissal of certain claims. Dkt. 35.

On January 7, 2019, after the close of discovery, the Court held a pre-motion conference in which defendants indicated they would move for summary judgment. On February 22, 2019, defendants filed their motion for summary judgment, a memorandum of law, Dkt. 77 ("Def. Mem."), and supporting documents, Dkts. 73–77. On March 18, 2019, Wilkinson filed a memorandum, Dkt. 80 ("Pl. Mem."), and supporting documents in opposition to defendants' motion, Dkts. 80–85. On April 1, 2019, defendants filed a reply. Dkts. 86–88.

## II.     Applicable Legal Standards

### A.     Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.     Retaliation Under Title VII

Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Title VII thus is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

In evaluating Title VII retaliation claims, "courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*," 411 U.S. 792, 802–05 (1973). *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he participated in a protected activity; (2) participation in the protected activity was known to the employer; (3) the employer thereafter subjected him to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See id.* The NYCHRL imposes an identical standard, "except that the plaintiff need not prove any 'adverse' employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Leon v. Columbia Univ. Med. Ctr.*, No. 11 Civ. 8559 (NSR), 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013), *aff'd*, 597 F. App'x 30 (2d Cir. 2015). The burden of proof at the *prima facie* stage is "de minimis." *Hicks*, 593 F.3d at 164.

"At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action . . . . If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action." *Kaytor*, 609 F.3d at 552–53 (citation and internal quotation marks omitted).

### III. Discussion

Defendants' sole argument for summary judgment is that Wilkinson fails to make out a *prima facie* case of retaliation. First, they argue, Wilkinson cannot demonstrate that he engaged in any protected activity. Second, assuming Wilkinson did engage in protected activity, defendants contend that Wilkinson cannot produce any evidence that defendants were aware of such activity. And, finally, defendants argue that Wilkinson cannot demonstrate a causal nexus between any protected activity and his termination. The Court addresses each argument in turn.

### A. Protected Activity

Defendants first argue that Wilkinson's retaliation claim centers on the 4/18/16 Email he wrote to Nicky Duggan Redfern, Nord Anglia's Head of Human Resources, but that this email does not protest or oppose unlawful discrimination. Def. Mem. at 6. Rather, defendants argue, the email contains only complaints from Wilkinson about tough management, and that such complaints do not constitute protected activity. Wilkinson counters that the record contains evidence sufficient to permit the conclusion that he engaged in protected activity. He argues that there is evidence that on April 6, 2016, Lufuluabo sent an email explicitly complaining about discriminatory treatment. That same day, Wilkinson asserts, he was on a conference call with his managers in which he supported Lufuluabo's discrimination complaint. Wilkinson also disputes defendants' characterization of the email, arguing that in the email he supports Lufuluabo's claim of racial discrimination, and, therefore, engaged in protected activity. Pl. Mem. at 16–17.

The Court holds, with Wilkinson, that there is sufficient evidence in the record from which a factfinder could conclude that Wilkinson engaged in protected activity. Under Title VII and parallel state and municipal law, a plaintiff has engaged in protected activity where he "has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a). The

term "oppose," which the statute does not define, "carries its ordinary dictionary meaning: to resist or antagonize; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009) (internal citations, quotation marks, and alterations omitted). Indeed, "[w]hen an employee communicates to her employer a belief that the employer had engaged in a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Id.* (internal quotation marks and alterations omitted). Thus, "even informal complaints to management constitute opposition for purposes of demonstrating protected activity." *McPartlan-Hurson v. Westchester Cmty. Coll.*, No. 13 Civ. 2467 (NSR), 2018 WL 3104094, at *14 (S.D.N.Y. June 21, 2018). Expressing support for a co-worker who has formally complained of discrimination also constitutes protected activity. *See Weiss v. Hustedt Chevrolet*, No. 05 Civ. 4230 (DRH) (MLO), 2009 WL 2132444, at *13 (E.D.N.Y. July 13, 2009) (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

On April 6, 2016, Lufuluabo emailed Wilkinson, Padilla, and Bricheno to complain about how Nord Anglia handled her abuse allegation. She wrote that she had seen "minor incidents treated with more concern" than her allegation of sexual abuse, and complained that she felt she and her son were "being discriminated against because of [their] race." April 6, 2016 Correspondence at 3. Shortly after receiving Lufuluabo's email, Padilla emailed Wilkinson and Bricheno to organize a conference call. *Id.* at 2. According to Wilkinson, on that conference call he expressly supported Lufuluabo's discrimination complaint and stated that he felt Lufuluabo's complaints of a lack of inclusivity and diversity at Nord Anglia were valid. Pl. 56.1 ¶ P. Wilkinson's account, if credited, would establish that Wilkinson engaged in protected activity by expressing support for Lufuluabo's explicit racial discrimination claim. To be sure, defendants

flatly dispute Wilkinson's account of the April 6, 2016 conference call. Def. Reply 56.1 at 13–14. But this dispute of fact defeats defendants' argument, at the summary judgment stage, that Wilkinson did not engage in protected activity.

Even if one disregards Wilkinson's claims regarding the April 6 Conference Call, as defendants urge, the 4/18/16 Email permits a factfinder to conclude that Wilkinson engaged in protected activity. In defendants' view, in the email Wilkinson complains of only "tough and direct line management." Def. Mem. at 6. And defendants emphasize that although the email discusses the alleged abuse incident involving Lufuluabo's son, the email does not mention any alleged discrimination. *Id.* at 9. Defendants are correct that Wilkinson's email—which runs six single-spaced pages—documents a laundry list of complaints, many of which are unrelated to charges of racial bias. But their argument that Wilkinson did not express support for Lufuluabo's discrimination complaint mischaracterizes the email. Drawing all reasonable inferences in Wilkinson's favor, the email supports the conclusion that Wilkinson was complaining of discriminatory employment practices. In it, Wilkinson writes that after his superiors learned of the alleged abuse incident, Nord Anglia gave only "scant feedback" about how to proceed. 4/18/16 Email at 4. Rather than treating the incident with the gravity it merited, Wilkinson wrote, Nord Anglia managers instead focused on Lufuluabo and her son, questioning Wilkinson about why Lufuluabo's son was offered a scholarship at all; Wilkinson writes in the email that he explained that the New York School suffered from a lack of diversity and Lufuluabo's son was the only African-American student. Significantly, Wilkinson writes that he was "interrogated" about the position Lufuluabo held at the school; that management's questions about Lufuluabo and her son were unrelated to their serious abuse allegations; that Padilla, a senior Nord Anglia official, was enthusiastic about the prospect of Lufuluabo leaving the school

16

and "continued asking [Lufuluabo] when she was going to leave"; that Padilla had never exhibited such an interest in another staff member; and that Wilkinson found such questions inappropriate. *Id.*

A factfinder reviewing this email reasonably could conclude that Wilkinson was supporting an African-American colleague's complaint of racial bias and, therefore, that Wilkinson engaged in protected activity. Although Wilkinson does not explicitly use the words "racist" or "discrimination" to describe his perception of Nord Anglia's conduct, he states that Nord Anglia management inappropriately minimized Lufuluabo's abuse allegations, that they asked "inappropriate" questions about the presence of Lufuluabo and her son at the New York School, and that Padilla took an interest in seeing Lufuluabo leave her position and had "never shown such ongoing interest" in the fate of other staff members. *Id.* And the context here is significant. Wilkinson sent his email in support of Lufuluabo less than two weeks after Lufuluabo contacted Wilkinson and other Nord Anglia officials complaining that she felt that she was "being discriminated against because of [her] race." April 6, 2015 Correspondence at 4. That Wilkinson's email followed so soon after Lufuluabo's explicit complaints of racial discrimination, and that Wilkinson unambiguously defends Lufuluabo and criticizes Nord Anglia's treatment of her, lends further support to the conclusion that Wilkinson was supporting his colleague's complaint of racial bias and, therefore, engaging in protected activity.

**B.     Defendants' Awareness of Wilkinson's Protected Activity**

Defendants next contend that, even if Wilkinson engaged in protected conduct, he cannot demonstrate that defendants were aware of his protected activity. To ensure that the employer is on notice of the allegedly unlawful conduct, "the onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class

and that he is not complaining merely of unfair treatment generally." *Aspilaire v. Wyeth Pharmas., Inc.*, 612 F. Supp. 289, 308–09 (S.D.N.Y. 2009). Thus, merely notifying an employer of discriminatory conduct, without specificity, does not qualify as protected activity." *Pouncy v. Advanced Focus LLC*, No. 15 Civ. 6260 (JMF), 2017 WL 4280949, at *6 n.3 (S.D.N.Y. Sept. 25, 2017) (internal quotation marks omitted). In making this argument, defendants emphasize that Wilkinson's 4/18/16 Email does not expressly reference race-based discrimination.

Defendants' argument is unpersuasive. First, defendants ignore Wilkinson's assertion that, in the April 6, 2016 Conference Call, he "orally agreed that the grievances that [Lufuluabo] enumerated in her email were valid, including her complaint of lack of inclusivity and diversity at Nord Anglia." Wilkinson Decl. ¶ 85. Although defendants vigorously dispute Wilkinson's assertion that he made such a statement, at the summary judgment stage the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in Wilkinson's favor. *Johnson*, 680 F.3d at 236. Once again, if a jury credited Wilkinson's version of events, it could conclude that Wilkinson made clear that his complaints, on Lufuluabo's behalf, were explicitly based on Lufuluabo's membership in a protected class. The 4/18/16 Email also supports the conclusion that Wilkinson made sufficiently clear that he was complaining that Lufuluabo was experiencing mistreatment on account of her race. As noted, Wilkinson expressed the view that Nord Anglia managers were hostile to Lufuluabo; treated her differently, and worse, than other employees; and—instead of addressing Lufuluabo's serious abuse allegations—seemed preoccupied with why Lufuluabo's African-American son was receiving a scholarship. Defendants are correct that Wilkinson did not explicitly state that he was complaining of race-based discrimination. But his email—particularly against the context of Lufuluabo's own

complaint, which *did* explicitly complain of such discrimination—makes sufficiently clear that Wilkinson's complaint was based on Lufuluabo's membership in a protected class.

### C. Causal Nexus Between Wilkinson's Activities and his Termination

Finally, defendants argue that Wilkinson cannot demonstrate a sufficient causal connection between his protected activities in April 2016, and his termination in June 2016. In particular, they argue that the undisputed facts show that Wilkinson's termination was imminent even before he engaged in protected activity. The Court does not find summary judgment warranted on this basis, either.

Plaintiffs may prove a causal connection "either through direct evidence of a retaliatory animus or indirectly through evidence, for example, of the close proximity in time of the two events." *Dayes v. Pace Univ.*, 2 F. App'x 204, 208 (2d Cir. 2001) (summary order) (citing *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "A plaintiff alleging retaliation in violation of Title VII, however, must show at the final step of the analysis that retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision. *Pouncy*, 2017 WL 4280949, at *6 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)). It is well established that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity. *See Cayemittes v. City of New York Dept. of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (no causation where "progressive discipline" began prior to plaintiff's filing of EEOC charges); *Tomasino v. St. John's Univ.*, 476 F. App'x. 923, 925 (2d Cir. 2012) ("[B]ecause the record is replete with undisputed evidence that Defendant imposed progressive discipline against Tomasino well before September, an inference of

discrimination will not arise based solely on the proximity between her complaint and termination.").

Wilkinson argues that there are two independent grounds for establishing a causal nexus between his protected activities and an adverse employment action: discriminatory animus, and the tight temporal proximity between his protected activities, which took place no later than April 2016, and his termination, which took place two months later, in June 2016. Indeed, the close temporal link of just two months between Wilkinson's protected conduct and his termination, standing alone, is sufficient to permit an inference of causation. *See Garcia v. Yonkers Bd. of Educ.*, No. 15 Civ. 767 (NSR), 2018 WL 4007648, at *7 (S.D.N.Y. Aug. 21, 2018) (collecting cases and holding that a period of three months "would, alone, be enough to meet a causal connection"). Indeed, given Wilkinson's role as a principal, and that his protected activities occurred late in the school year, a factfinder could infer that, after Wilkinson's complaints, Nord Anglia terminated Wilkinson at the earliest practicable opportunity, immediately after the school year ended.

For its part, Nord Anglia contends that the undisputed evidence shows that its decision to terminate Wilkinson was made before Wilkinson's allegedly protected activities in April 2016, and was based on Wilkinson's performance. In support, defendants point to several pieces of evidence. First, they identify a March 2015 Report, which states, "[a]s a result of the many issues at the school, the regional team conducted an intensive session with [Wilkinson]. This included an HR review as well as marketing/admissions review. We will be developing a new strategic plan and are likely to propose a change of leadership at the school, with primary focus on changing both the business manager and the Principal." Def. 56.1 ¶ 31. Defendants also note that August and September 2015 Reports stated that "[c]oncerns regarding the leadership of the

20

school continue." Def. 56.1 ¶¶ 44–45. And defendants point to the September 2015 Talent Profile and the February 25, 2016 Recording that, in their view, records a conversation in which Padilla discusses replacing Wilkinson.

The Court regards this as a closer question than those addressed above. However, drawing all permissible factual inferences in Wilkinson's favor—as is required at the summary judgment stage—the Court finds defendants' argument unavailing.

Notably, the March 2015 Report, which raises the possibility of replacing Wilkinson as principal, is relatively remote in time from Wilkinson's actual termination—it was prepared 15 months before Wilkinson was actually terminated. A factfinder could conclude, therefore, that although there was some indication in spring 2015 that Nord Anglia was considering replacing Wilkinson, it ultimately decided to abandon, or at least not to commit to, that course of action—until Wilkinson allegedly engaged in protected activities, soon after which it terminated him. As to the August and September 2015 Reports, which reflect "concerns" about "leadership" at the New York School, these reports are well short of conclusive. They do not indicate that Wilkinson is facing termination; indeed, they do not mention Wilkinson, or the position of the principal, at all. A factfinder could conclude that these references reflect a desire by Nord Anglia to take steps to improve employee performance at the New York School without resorting to the termination of employees. Or it could demonstrate an intent to replace other administrators. Such an inference is strengthened by the references, in the August and September Reports, to the replacement of the New York School's business manager and the onboarding of a new manager. Or it could reflect consideration of terminating Wilkinson, but not a firm decision to do so.

Nor does the February 25, 2016 Recording carry the day for defendants. Regardless whether the recording was clandestine and illicit, as defendants argue, or inadvertent, as Wilkinson claims, it does not compel the conclusion that, as of February 2016, Nord Anglia had surely decided to terminate Wilkinson. Only fragments of the conversation are recorded; much are inaudible. And the recording is devoid of context; it is difficult confidently to ascertain the subject matter or significance of even those fragments that are audible and transcribed. The recording on its face is susceptible to alternative inferences. To be sure, Padilla states in her affidavit that, on the recording, she was discussing replacing Wilkinson. Padilla Aff. ¶ 4. But a factfinder, listening to the recording and faced with competing interpretations or explanations, need not credit her account, or that the participants understood the die to be then cast as to Wilkinson's termination.

The most significant evidence in support of defendants' position is the September 2015 Talent Profile. In the profile, Wilkinson receives mediocre scores of "Developing" and "Needs Improvement." And the profile states, "[i]t is likely [Wilkinson] will be removed from post within 12 months." Def. 56.1 ¶ 57. That statement, in isolation, tends to support defendants' position that the decision likely to terminate Wilkinson had been made in advance of, indeed well before, Wilkinson engaged in protected activities as of April 2019. But the profile on its face depicts Wilkinson's termination as "likely," not as inevitable. And, crucially, other evidence calls into question whether Nord Anglia was committed to terminating Wilkinson, and, if so, when. In particular, at some point before April 18, 2016, Wilkinson discovered a notebook belonging to Padilla. The notebook contained a page listing various Nord Anglia principals, with the caption "2015–2016." *See* Padilla Notes. Next to each name, there is a short note. Next to Wilkinson's name is a question mark. Defendants argue that this question mark supports their

view that they had made a "decision to replace [Wilkinson] as principal in the New York School" before he engaged in his protected activities. Def. Mem. at 15. But a question mark, presumably, reflects a question—*i.e.*, there was uncertainty regarding Nord Anglia's intentions with respect to Wilkinson. Padilla's notes could mean that Wilkinson would be terminated. Or they could mean that Wilkinson could be demoted, or transferred to a different position, or made principal of another school, or undergo training, or be kept in his current post. Or it could reflect that his termination was likely, but with the final outcome to hinge on future developments. Revealingly, the word "out" is written next to the name of two other principals, which appears to reflect a decision that those individuals would assuredly be terminated. The word "out" is not written next to Wilkinson's name, which suggests that, at the very least, at the time the notes were written some time before April 18, 2016, Nord Anglia managers had not reached a decision with respect to Wilkinson's fate.

The Court therefore rejects defendants' sole argument that Wilkinson has failed to make out a *prima facie* case of retaliation. There are genuine disputes of material fact that preclude an award of summary judgment. The Court therefore denies defendants' motion.

## CONCLUSION

For the reasons set forth above, the Court denies defendants' motion for summary judgment. The Court directs the parties to file, by August 12, 2019, a joint letter setting forth their respective views as to next steps in this litigation. The Court respectfully directs the Clerk of Court to terminate the motion pending at docket entry 73.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: July 29, 2019
New York, New York